Henry E. HOWELL, Jr., et al.,

v.

Joan S. MAHAN et al.

Stanford E. PARRIS et al.,

v.

Edgar A. PRICHARD et al.

Clive L. DuVAL, II, et al.,

v.

Edgar A. PRICHARD et al.

Civ. A. Nos. 105–71–N, 111–71–A,
174–71–R.

United States District Court,
E. D. Virginia,
Norfolk, Alexandria and Richmond
Divisions.

July 2, 1971.

Edmund D. Campbell, Arlington, Va., for Clive L. DuVal.

Henry E. Howell, Jr., pro se.

Stanford E. Parris, pro se.

Andrew P. Miller, Atty. Gen. of Va., Anthony F. Troy, Theodore J. Markow, Asst. Attys. Gen., for defendants.

James M. Thomson, pro se.

Gordon B. Taylor, Jr., Norfolk, Va., for intervenor City of Norfolk.

J. Dale Bimson, Virginia Beach, Va., for intervenor City of Virginia Beach.

Armand Durfner, R. Stephen Browning, Washington, D. C., for black plaintiffs intervenors.

Before ALBERT V. BRYAN, Circuit Judge, and LEWIS, MacKENZIE and MERHIGE, District Judges.

ALBERT V. BRYAN, Circuit Judge:

The Constitution of Virginia, Article II, Section 6 directs, inter alia, that "members of the Senate and of the House of Delegates of the General Assembly shall be elected from electoral districts established by the General Assembly [the legislature]" and that "[e]very electoral district shall be composed of contiguous and compact territory and shall be so constituted as to give, as nearly as is practicable, representation in proportion to the population of the district". Article IV provides for a Senate of not more than 40 and not less than 33 members, and a House of Delegates of not more than 100 and not less than 90. Reapportionment of the Commonwealth into districts was required for 1971 and every ten years thereafter.

Validity of the General Assembly's present effort to meet this obligation is at stake in these three suits. By an

Act approved March 1, 1971, Chapter 116, Acts of Assembly, Code § 24.1–12.1, the State was divided into 52 districts for the election of 100 members of the House of Delegates. This enactment is here attacked by the plaintiffs in DuVal, et al. v. Prichard, et al. and Parris, et al. v. Prichard, et al., as well as by William S. Thornton, et al., plaintiff-intervenors in the DuVal case, chiefly as failing to provide "representation in proportion to the population of the district." Aside from this common ground, *DuVal* strikes at the provision for multi-member districts, while *Parris* complains of the division of Fairfax County into two districts of five delegates each, rather than its continuance as a whole district with 10 delegates. The *Thornton* plaintiffs object that black residents of several metropolitan areas are denied full voting strength by multi-member districts.

By another Act approved March 1, 1971, Chapter 120, Acts of Assembly, Code § 24.1–14.1 as amended by an Act approved June 14, 1971, Chapter 246, Acts of Assembly, the State was partitioned into 40 districts for election of 40 senators, one from each district. This Act is not questioned by the *DuVal* and *Parris* original or intervening plaintiffs. But Howell, et al. v. Mahan, et al. condemns it as breaching the Virginia Constitution's demand for equal district representation. In this legislation the City of Norfolk has been split into three districts: 5th, 6th and 7th, the last supplemented by a slice of abutting City of Virginia Beach. Specifically, the *Howell* protest is that as drawn the districts are unbalanced (1) by the allocation of servicemen aboard Navy ships "home-ported" in Norfolk, (2) by including Government reservations which do not permit political campaigns thereon, and (3) in circumscribing the Negro electors principally into one district.

Obviously, in each of these three suits the protestations, if sustained, would establish contraventions of the Equal Protection Clause of the Fourteenth Amendment and transgress the now familiar doctrine of "one man, one vote". Kirkpatrick v. Preisler, 394 U.S. 526, 530, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969); Wells v. Rockefeller, 394 U.S. 542, 546, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969); Reynolds v. Sims, 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Our search, therefore, is a factual scrutiny of the reapportionment Acts for such deviations, if any, as may be impermissible under the State and Federal constitutions.

With the population count of Virginia by the 1970 decennial census amounting to 4,648,494, each of the 100 members of the House of Delegates should represent approximately 46,485 persons. Nevertheless, we find throughout the State numerous instances of delegate representation which have not been so evened in the reapportionment statutes. Seemingly, the variances are traceable to the desire of the General Assembly to maintain the integrity of traditional county and city boundaries. Senatorial assignments have uniformly been restricted to one senator per district. The only attack on the senatorial plan is the division of the City of Norfolk into three districts.

A foremost example of disparateness is the 16th district. It is composed of Rockingham, Page and Shenandoah counties and the City of Harrisonburg, with a population of 101,928, and allotted two delegates—one for each 50,964—thus exceeding the norm of 46,485, and under-represented by 9.6%. On the contrary, district 12 comprising Campbell County has a delegate for 43,319 and so is over-represented by 6.8%, making the total disparity 16.4%.[1]

1. The Court notes that this range of deviation may exceed 16.4%. The Forty-second District, a floater shared by the cities of Chesapeake, Portsmouth and Virginia Beach, together with Chesapeake's two-delegate complement in the Thirty-eighth District, causes an over-representation of Chesapeake voters by 14% according to the calculation of the *DuVal* plaintiffs. The statewide range of deviation would therefore be 23.6%. Plans including a variation of approximately that amount

This variation is sufficient to condemn the plan. In reapportionment cases the burden is on the State to justify deviations from parity by "legitimate considerations incident to the effectuation of a rational state policy." Reynolds v. Sims, supra, 377 U.S. 533, 579, 84 S.Ct. 1362, 1391, 12 L.Ed.2d 506 (1964); see Swann v. Adams, 385 U.S. 440, 444, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967). The State has proved no governmental necessity for strictly adhering to political subdivision lines. Further, the General Assembly has not consistently implemented its asserted policy, as witness the division of Fairfax County.

These unconstitutional disparities can be remedied in most instances by merely shifting district lines, leaving undisturbed the numerical allocation of delegates to districts. It is an adequate remedy whenever malapportionment arises from over-population in a district which is contiguous to one or more under-populated districts. We have endeavored to pursue this adjustment wherever feasible because it fosters the clear preference of the Assembly to adopt recognized political subdivision lines in apportioning delegates. An exception, however, to the effectiveness of this remedial device necessarily arises when a cluster of districts is over-represented, and there is no contiguous district which has an off-setting under-representation. The drafting of district lines to dissolve this regional concentration of disparity is formidable; it is not achievable at all if the integrity of political subdivisions is mandated.

To accomplish constitutional reapportionment throughout Virginia we have been compelled to draft a plan consisting of the Assembly's layout with necessary amendments. The plan of reapportionment now drawn by the court follows the Assembly's district numbers.

As to each district there is given the number of delegates, the total population, the composition by political subdivisions of present boundaries and, where enlarged or reduced, the percentage of the increase or decrease. The source of every change is either existing political subdivisions or the descriptions provided by Enumeration Districts (ED), Block Groups (BG) or Census Tracts (CT) provided by the United States Bureau of the Census for 1970. The number of persons in the district exceeding or falling beneath the norm of 46,485 is expressed in percentages, with a plus (+) percentage indicating an excess in population and a minus (−) showing a population deficiency; consequently, a plus population percentage reveals an under-representation, with a minus sign pointing to an over-representation. The plan is this:

Districts for the Virginia House of Delegates shall be constituted as follows:

1. First: 2 delegates; existing population 100,722—a deviation of +8.3%—consisting of Dickenson, Lee, Wise and Scott counties with the town of Norton. This district shall be altered by a transfer of Enumeration Districts 14 (pop. 1,676), 19 (pop. 1,004), 23 (pop. 986), 24 (pop. 1,309) and 25 (pop. 1,088) in Scott County to the contiguous Second District, reducing the total population of the First to 94,659 (100,722 less 6,063) creating a deviation of +1.8%.

2. Second: 2 delegates; existing population 87,041—a deviation of −6.4%—consisting of the City of Bristol and the counties of Smyth and Washington. This district shall gain ED's 14, 19, 23, 24 and 25 from Scott County, contiguous

have not survived Supreme Court scrutiny. Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (June 7, 1971); Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967). The Supreme Court has indicated approval of the DuVal method of computing percentage deviations for floterial districts in Kilgarlin v. Hill, 386 U.S. 120, 124, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967). The State argues that the deviation for Chesapeake is only +.2%, the average deviation for all areas which share the floater delegate. Under either mode of calculation, we find that the statewide range of deviation will not pass constitutional muster.

to Washington County, br total population to 93,104 ( 6,063) leaving a deviation per seat.

3. Third: 2 delegates; ex ulation 96,420—a deviation o consisting of Russell, Tazewell and Buchanan counties. This district shall remain unchanged.

4. Fourth: 1 delegate; existing population 49,279—a deviation of +6.0%—consisting of Wythe, Grayson and Bland counties along with the City of Galax. This district will lose ED's 2 (pop. 331) and 23 (pop. 1,271) from Wythe County to be added to the contiguous Sixth District, reducing the total population of the Fourth to 47,677, with a resulting deviation of +2.56%.

5. Fifth: 1 delegate; existing population 49,829—a deviation of +7.2%—made up of Craig, Giles and Pulaski counties. This district shall lose all of Craig County (pop. 3,524) to the Eighth District, leaving the Fifth with a total population of 46,305 (49,829 less 3,524), a deviation of −0.39%.

6. Sixth: 2 delegates; existing population 91,620—a deviation of −1.5%—consisting of Carroll, Floyd and Montgomery counties and the City of Radford. This district shall gain ED's 2 and 23 from contiguous Wythe County of the Fourth District, leaving a total population in the Sixth of 93,222 (91,620 plus 1,602) producing a deviation of +0.27%.

7. Seventh: 2 delegates; existing population 92,115—a deviation of −0.9%—consisting of the City of Roanoke. This district shall remain unaltered.

8. Eighth: 2 delegates; existing population 89,321—a deviation of −3.9%—consisting of Roanoke County and the City of Salem. To this district shall be added contiguous Craig County from the Fifth, leaving the Eighth with an aggregate population of 92,845 (89,321 plus 3,524), which produces a deviation of -0.14%.

9. Ninth: 2 delegates; existing population 91,561—a deviation of −1.5%—consisting of Franklin, Rockbridge and Bedford counties along with the cities of Bedford, Lexington and Buena Vista. This district shall remain unchanged.

10. Tenth: 1 delegate; existing population 46,215—a deviation of −0.6%—consisting of the counties of Alleghany and Botetourt and the cities of Clifton Forge and Covington. This district will remain unchanged.

11. Eleventh: 2 delegates; existing population 91,857—a deviation of −4.2%—consisting of the City of Lynchburg and the counties of Amherst and Nelson. The district shall gain ED's 26 (pop. 1,070) and 31 (pop. 1,022) from Albemarle County of the contiguous Twenty-sixth District, bringing the population of the Eleventh up to 93,949 (91,857 plus 2,092), leaving a deviation of +1.0%.

12. Twelfth: 1 delegate; existing population 43,319—a deviation of −6.8%—consisting of only Campbell County. This district shall be augmented in size by the addition of ED's 8 (pop. 678), 9 (pop. 836), 10 (pop. 260) and 12 (pop. 990) from contiguous Charlotte County of the Twenty-eighth District, bringing up the total population of the Twelfth to 46,083 (43,319 plus 2,764) resulting in a deviation of −0.9%.

13. Thirteenth: 3 delegates; existing population 144,625—a deviation of +3.7%—consisting of the counties of Patrick, Henry, Pittsylvania and the City of Martinsville. This district shall be left unchanged.

14. Fourteenth: 1 delegate; existing population 46,391—a deviation of −0.2%—consisting of the City of Danville. It will not be altered.

15. Fifteenth: 2 delegates; existing population 93,152—a deviation of +0.2%—consisting of the cities of Staunton and Waynesboro and the counties of Augusta, Highland and Bath. This district will remain unchanged.

16. Sixteenth: 2 delegates; existing population 101,928—a deviation of +9.6%—consisting of Rockingham, Page and Shenandoah counties, plus the City of Harrisonburg. This district shall be reduced in size by excising the eastern-

most Enumeration Districts from Rockingham County, adding them to the adjacent Twenty-sixth District, where Albemarle and Greene Counties border on Rockingham County. The area removed from the Sixteenth will include ED's 20 (pop. 1,158), 23 (pop. 1,223), 24 (pop. 1,441), 27 (pop. 1,143), 28 (pop. 898) and 29 (pop. 0—but must be included to provide *contiguity*). This will decrease the population of the Sixteenth to 96,065 (101,928 less 5,863), reducing the deviation to +3.30%.

17. Seventeenth: 2 delegates; existing population 93,314—a deviation of +0.4%—consisting of the counties of Frederick, Clarke, Fauquier and Warren, including also the City of Winchester. No change is to be made here.

18. Eighteenth: 5 delegates; existing population 246,509—a deviation of +6.1%—consisting of the cities of Fairfax and Falls Church and that portion of Fairfax County which lies in the Tenth Congressional District as delineated in Virginia Code, § 24.1–4.1. This district shall be changed by deleting the City of Fairfax and Fairfax County CT's 4030 (pop. 2,825) and 4031 (pop. 4,298), but adding Fairfax County CT's 4035 (pop. 6,511) and 4036 (pop. 3,396). This results in an adjusted total population of the Eighteenth of 227,323, which produces a deviation of –2.3%.

19. Nineteenth: Formerly 5 delegates—now changed to 6; existing population 241,254—a deviation of +3.8%—consisting of that part of Fairfax County situated in the Eighth Congressional District as set forth in Virginia Code § 24.1–4.1, supra. This district shall be altered to include CT's 9001 (pop. 1,595) and 9002 (pop. 8,008) along with ED's 63 (pop. 631), 71 (pop. 1,255) and 72 (pop. 956) from CT 9006, all from Prince William County, together with Fairfax City (21,970) and that portion of Fairfax County designated as the Eighth Congressional District, supra, less CT's 4035 and 4036, but adding CT's 4030 and 4031. [illegible]lting district will then have a [illegible]pulation of 272,885, producing a [illegible]n of –2.2%.

[illegible]Twentieth: 3 delegates; existing po[illegible]ion 148,252—a deviation of +6.[illegible]—consisting of the counties of Loudoun and Prince William. This district will be altered by deleting CT's 9001, 9002 and ED's 63, 71 and 72 from CT 9006, all from Prince William County to be assigned to the Nineteenth. This change will leave the total population of the Twentieth at 135,807, producing a deviation of –2.6%.

21. Twenty-first: 2 delegates; existing population 110,938—a deviation of +2.3% (calculated with reference to the floater described as District Twenty-three)—consisting of the City of Alexandria. This will not be changed.

22. Twenty-second: 3 delegates; existing population 174,284—a deviation of +2.3% (calculated with reference to the floater described as District Twenty-three)—consisting of the County of Arlington. This district will remain unaltered.

23. Twenty-third: 1 delegate; existing population 285,222—a deviation of +2.3% (calculated with reference to Districts Twenty-one and Twenty-two)—this is a floater district consisting of the City of Alexandria and the County of Arlington. Nothing will be changed here.[2]

24. Twenty-fourth: 2 delegates; existing population 90,441—a deviation of –2.7%—consisting of the counties of Hanover, Caroline and Stafford, plus the City of Fredericksburg. No adjustment has been made here.

25. Twenty-fifth: 1 delegate; existing population 45,847—a deviation of –1.4%—consisting of the counties of Culpeper, Rappahannock, Madison and Orange. No change will occur here.

26. Twenty-sixth: 2 delegates; existing population 89,529—a deviation of –3.7%—consisting of the counties of

2. See note 1, supra, regarding computation of Chesapeake under the alternative theory espoused in *DuVal*. Applying this theory to the floater here results in a deviation of –0.1% for Alexandria and a deviation of +3.9% for Arlington.

Albemarle, Greene and Fluvanna and the City of Charlottesville. This district will be altered in order to adjust the imbalances present in the adjoining Sixteenth and Eleventh districts, discussed above. Added to the Twenty-sixth will be ED's 20, 23, 24, 27, 28 and 29 from adjacent Rockingham County (Sixteenth), on the west; lost to the contiguous Nelson County (Eleventh) on the south will be ED's 26 (pop. 1,070) and 31 (pop. 1,022) from Albemarle County. These changes will produce a total population in the Twenty-sixth of 93,300, with a resulting deviation of +0.35%.

27. Twenty-seventh: 1 delegate; existing population 48,531—a deviation of +4.4%—consisting of the counties of Appomattox, Buckingham, Cumberland, Amelia and Prince Edward. This district shall lose ED's 1 (pop. 726), 2 (pop. 1,038) and 3 (pop. 532) from Amelia County to the adjacent Thirty-first District, reducing the population of the Twenty-seventh to 46,235 (48,531 less 2,296) producing a deviation of –0.54%.

28. Twenty-eighth: 1 delegate; existing population 48,516—a deviation of +4.4%—consisting of the counties of Halifax and Charlotte along with the City of South Boston. This district will be diminished in population by removing ED's 8 (pop. 678), 9 (pop. 836), 10 (pop. 260) and 12 (pop. 990) in Charlotte County to be added to contiguous Campbell County in the Twelfth. The change will reduce the population of the Twenty-eighth to 45,752 (48,516 less 2,764), producing a deviation of —1.6%.

29. Twenty-ninth: 1 delegate; existing population 45,598—a deviation of —1.9%—consisting of the counties of Brunswick and Mecklenburg. No alteration will be made here.

30. Thirtieth: 1 delegate; existing population 45,103 (includes 9,000 from annexed area)—a deviation of —3.0%—consisting of the City of Petersburg. This district shall keep its present delineation.

31. Thirty-first: 1 delegate; existing population 46,978 (includes loss from annexation)—a deviation of +1.1%—consisting of the counties of Dinwiddie, Lunenburg and Nottoway. This district shall be altered in order to reduce imbalances in the adjacent Twenty-seventh and Forty-fifth districts. The Thirty-first will lose ED's 16 (pop. 489), 17 (pop. 1,392) and 18 (pop. 841) of Dinwiddie County to the contiguous *Forty-fifth District, but the Thirty-first* District will be augmented by the addition of ED's 1, 2 and 3 from Amelia County (Twenty-seventh), as discussed above. These changes will leave the Thirty-first with a total population of 46,552 (46,978 less 2,722, plus 2,296), with a resulting deviation of +0.14%.

32. Thirty-second: 1 delegate; existing population 48,193—a deviation of +3.7%—consisting of the counties of Louisa, Spottsylvania, Goochland and Powhatan. No change will occur here.

33. Thirty-third: 5 delegates; existing population 249,621—a deviation of —3.4% (calculated with reference to the floater described as District Thirty-five) —consisting of the City of Richmond. This will not be altered.

34. Thirty-fourth: 3 delegates; existing population 154,364—a deviation of —3.4% (calculated with reference to the floater described as District Thirty-five) —consisting of the County of Henrico. No change will be effected here.

35. Thirty-fifth: 1 delegate; existing population 403,985—a deviation of —3.4% (calculated with reference to Districts Thirty-four and Thirty-five)—this is a floater district consisting of the City of Richmond and the County of Henrico. This district will remain unaltered.[3]

36. Thirty-sixth: 2 delegates; existing population 91,952—a deviation of —1.1%—consisting of the County of Chesterfield and the City of Colonial Heights. This district will be left unchanged.

3. See note 1, supra. Under the DuVal computation, Richmond City and Henrico County have population deviations of –4.4% and –1.8%, respectively.

37. Thirty-seventh: 1 delegate; existing population 47,146—a deviation of +1.4%—consisting of the City of Hopewell and the County of Prince George excluding those portions encompassed in the Thirtieth District. No change will be effected here.

38. Thirty-eighth: Formerly, 2 delegates; existing population 89,580—a deviation of +0.2% (calculated with reference to the floater comprising the Forty-second District, discussed below) —consisting of the City of Chesapeake. The Thirty-eighth District will be altered in order to evenly distribute the imbalance in this section of the State resulting from the transfer of one delegate to Northern Virginia as discussed above. The new Thirty-eighth will be allotted 4 delegates (thereby eliminating the Forty-second) and will encompass only the City of Chesapeake, excepting CT's 212 (pop. 2,316), 213.01 (pop. 1,887) and 215.01 (pop. 3,396) and the City of Portsmouth (pop. 110,963) giving a total population of 192,944 which is a deviation of +3.77%.

39. Thirty-ninth: 7 delegates; existing population 307,951—a deviation of −5.4%—consisting of the City of Norfolk. This district shall gain CT's 400 (pop. 2,087), 400.99 (pop. 5,642), 402 (pop. 2,649), 404 (pop. 3,877), 406 (pop. 1,247), 408 (pop. 7,793) and 412 (pop. 5,841) from the City of Virginia Beach. This will give the Thirty-ninth a population of 337,087 (307,951 plus 29,136) producing a deviation of +3.6%.

40. Fortieth: 3 delegates; existing population 172,106—a deviation of +0.2% (calculated with reference to the floater comprising the Forty-second)—consisting of the City of Virginia Beach. This district shall be altered by assigning to the Thirty-ninth CT's 400, 400.99, 402, 404, 406, 408 and 412 of Virginia Beach, as shown above, leaving the Fortieth with a total population of 142,970 (172,106 less 29,136), with a resulting deviation of +2.5%.

41. Forty-first: 2 delegates; existing population 110,963—a deviation of +0.2% (calculated with reference to the floater comprising the Forty-second)—consisting of the City of Portsmouth. The Forty-first District is hereby eliminated as a separate district since Portsmouth is now made part of the Thirty-eighth.

42. Forty-second: 1 delegate; existing population 372,649—a deviation of +0.2% (calculated with reference to Thirty-eighth, Fortieth and Forty-first districts, now consolidated into the Thirty-eighth and Fortieth)—consisting of the cities of Chesapeake, Portsmouth and Virginia Beach. This district is hereby eliminated, with Virginia Beach comprising the Fortieth, and Chesapeake (part) and Portsmouth comprising the Thirty-eighth, as shown above.[4]

43. Forty-third: 1 delegate; existing population 45,024—a deviation of −3.2%—consisting of Nansemond County and the City of Suffolk. This district will be altered by the addition of CT's 212, 213.01 and 215.01 from Chesapeake and also by the addition of the counties of Isle of Wight (pop. 18,285) and Southampton (pop. 18,582), along with the City of Franklin (pop. 6,880). This district will also be assigned another delegate, bringing the total number of delegates to 2, with a total population of 96,370. This produces a deviation of +3.66%.

44. Forty-fourth: 1 delegate; existing population 43,747—a deviation of −5.9%—consisting of the counties of Isle of Wight and Southampton and the City of Franklin. This district shall be eliminated since the territory which it embodied is now made part of the Forty-third, as shown above.

45. Forty-fifth: 1 delegate; existing population 43,708—a deviation of −6.0% —consisting of the counties of Greensville, Sussex, Surry, Charles City and New Kent, and the City of Emporia. This district shall be augmented by the

4. See note 1, supra. Applying DuVal's theory Virginia Beach would have had a deviation of +7.3% and Portsmouth a deviation of +6.1%.

addition of ED's 16 (pop. 489), 17 (pop. 1,392) and 18 (pop. 841) from Dinwiddie County adjacent to Sussex and Greensville counties. This change will bring the population of the Forty-fifth to 46,430 (43,708 plus 2,722), resulting in a deviation of −0.12%.

46. Forty-sixth: 1 delegate; existing population 43,446—a deviation of −6.5%—consisting of the counties of Accomack and Northampton. This is the maximum population deviation permitted in any district under the court's plan of reapportionment. The disparity is justified by the geographical location of the counties, known as the Eastern Shore. They form a neck of land separated by the Chesapeake Bay and the Atlantic Ocean from the mainland of Virginia, and are contiguous only to Maryland. The natural isolation of Accomack and Northampton counties warrants the deviation from the population standard. Consequently, the district shall remain as presently constituted.

47. Forty-seventh: Formerly: 1 delegate; existing population 44,387—a deviation of −4.5%—consisting of the counties of King George, Westmoreland, Northumberland, Richmond and Lancaster. This district shall be changed by the addition of ED's 1 (pop. 810) and 2 (pop. 949) out of Essex County (Forty-eighth), increasing the population of the Forty-seventh to 46,146 (44,387 plus 1,759), with the resulting deviation at −0.729%.

48. Forty-eighth: 1 delegate; existing population 47,609—a deviation of +2.4%—consisting of the counties of Essex, King and Queen, Middlesex, Gloucester, Mathews and King William. This district shall be reduced in size by the transfer of ED's 1 and 2 from Essex County to be assigned, as mentioned above, to the Forty-seventh. The total population of the Forty-eighth after the change will be 45,850, with a deviation of −1.366%.

49. Forty-ninth: 3 delegates; existing population 138,177—a deviation of −0.9%—consisting of the City of Newport News. No change is ordered here.

50. Fiftieth: 2 delegates; existing population 120,779—a deviation of −2.7%—(calculated with reference to the floater described as District Fifty-two) consisting of the City of Hampton. This district will remain unaltered.

51. Fifty-first: 1 delegate; existing population 60,125—a deviation of −2.7%—(calculated with reference to the floater described as District Fifty-two) consisting of the City of Williamsburg and the counties of York and James City. No change will be effected here.

52. Fifty-second: 1 delegate; existing population 180,904—a deviation of −2.7%—(calculated with reference to Districts Fifty and Fifty-one). This is a floater district consisting of the cities of Hampton and Williamsburg and the counties of York and James City. No alteration will be made here.[5]

Previously, we have alluded to the difficulty of equalizing districts when there is an over-represented group and there is no adjacent district which is under-represented. Examination of the delegate plan just outlined will reveal that this situation is sharply manifest in the Legislature's plan in districts 39, 43 and 44—City of Norfolk and Nansemond, Southampton and Isle of Wight counties—located in the Tidewater area. They are characterized by under-population of 4.8% and thus over-represented. Districts 18, 19, and 20 are a group in Northern Virginia non-contiguous to the under-populated districts of Tidewater. They are beset with an over-population with an average of 5.4%.

Actually, this is the apple of discord between the parties plaintiff in *DuVal-Parris* and the defendants who are upholding the current legislation. The only solution is the transfer of a delegate from Tidewater to Northern Virginia,

5. See note 1, supra. Applying the DuVal theory would produce a −2.7% deviation for Hampton, a −2.8% deviation for the combined populations of the City of Williamsburg and the counties of James City and York.

and it must be ordered. This is the only instance in which a delegate is transferred from one sector of the State to another. It is justified by the pervasive under-representation in districts in Northern Virginia, and over-representation in Tidewater, as earlier explained.

It is further justified by consideration of the growth trend of the Northern Virginia section as compared to that of Tidewater. Statewide, the average increase of population in the last 10 years has been at the rate of 17.2%. Northern Virginia's over the same period has increased 46% while during this same span Norfolk's increment has been only 1%. Authoritative estimates put the expansion expected for Northern Virginia at 3.1% and Norfolk's at .1% annually. This is an element to be weighed, for apprehended enlargement may be appraised in determining the measure of legislative representation. Kirkpatrick v. Preisler, supra, 394 U.S. 526, 535, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969).

In mapping the delegate districts to eliminate unconstitutional malapportionment the prayers of the plaintiffs in *DuVal* and *Thornton* for single-member districts have not been overlooked, but they have not been granted. In Whitcomb v. Chavis, supra, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (June 7, 1971), multi-member districts are declared not per se unconstitutional. Therefore the Assembly's adoption of the representational theory which embodies multi-member rather than single-member districts is accepted. We are not unaware of the preference for single-member districts in "large" areas expressed in Connor v. Johnson, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 690 (June 3, 1971), but we do not think this decision is preclusive here. The circumstances here shown permit the utilization of multi-member districts, and we think none of them is too "large" to be outlawed by *Connor*. The holding in that case required the elimination of a twelve member district; presently, the court's plan delineates no district with more than seven members.

Likewise, we do not grant the prayer of *Parris* for the conversion of Fairfax County into an undivided district. The General Assembly is not shown to our satisfaction to have been reversibly wrong in this determination. Further, the *Parris* claim of the lack of equal protection is nullified by the splitting of counties elsewhere to avoid population unevenness. Again, a district of 11 delegates could run into *Connor* criticism.

*Senatorial Districts*

As heretofore noted, the General Assembly chose to divide the State into forty single-member Senatorial districts. In applying this policy to Norfolk, and to ensure numerical equality, a contiguous urban area of the City of Virginia Beach, with its population count of 40,195, was added to Norfolk's 307,951 persons. The entire area was then divided into three single-member Senatorial Districts, the Fifth, Sixth and Seventh, which are equal according to the Federal Census, numerically and conform almost ideally to the one person, one vote requirement.

To do so, however, the entire count of 36,693 naval personnel "home-ported" at the U. S. Naval Station, Norfolk, were assigned to the Fifth Senatorial District. Factually, it is without dispute that only 8,100, or so, of such crewmen actually live aboard the vessels which are assigned to a Census Tract within the Fifth Senatorial District.[6] The remainder, with their families, resides for the most part in the City of Norfolk, but to a considerable degree *not* in the Fifth Senatorial District.

The court has before it, therefore, evidence that 36,693 naval personnel are allocated to the Fifth Senatorial District because that is where official Census Tracts count them, when, in fact, at least 18,000[7] live outside of the Fifth Sena-

6. Census policy allocates nearly all other individuals to the place where they reside.

7. A Navy housing sampling taken in the same month as the official Census indi-

torial District, but generally within the area encompassed by the Fifth, Sixth and Seventh Districts. The allocation of the crewmen of vessels "home-ported" at Norfolk to certain Census Tracts is completely acceptable for Census purposes. This suffices for Congressional redistricting since most of them reside within the Second Congressional District. However, it is demonstrably inaccurate as applied to the individual Senatorial Districts. It is also constitutionally impermissible to ignore their presence for the purpose of legislative redistricting. Davis v. Mann, 377 U.S. 678, 691, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964).

If the single-member districts of the area were allowed to stand, the Fifth Senatorial District, in actuality, could fall far short of the one man, one vote ideal. Similarly, the Sixth and Seventh Districts could also be considerably out of proportion.

The court concludes, therefore, that the only way to correct these latent disparities is to provide for one multi-member Senatorial District for the area presently comprising Districts Five, Six and Seven, wherein an at-large election shall be conducted. By such action naval "home-ported" personnel can be properly spread through the entire area. Multi-member districts in such cases are not unconstitutional. Whitcomb v. Chavis, supra, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (June 7, 1971). With this determination, we have no occasion to descant separately upon the other grounds urged by *Howell* for a unitary Senatorial District at Norfolk.

As hereinbefore mentioned the court is cognizant of the recent observation in Connor v. Johnson, supra, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (June 3, 1971), that single-member districts are preferable to "large multi-member districts" in reapportionment plans fashioned by District Courts, but again we do not consider this multi-member district to be "large" within the intent of that opinion.

The Court has no survey data as to place of actual residence sufficiently precise to permit creation of three single-member districts.

For an immediate understanding of the appearance of the delegate districts as now drawn, a chart depicting generally and substantially the mosaic will be presented herewith as an appendix. When superimposed upon the Legislature's reapportionment map, the changes now decreed become clearly evident. Blank spaces indicate areas of no change.

*Conclusion*

We have undertaken a complete reapportionment of the State, rather than attempting a piecemeal correction confined to the direct targets of the complaints. This, we understand, is the precept of Burns v. Richardson, 384 U.S. 73, 83, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966). While we have endeavored to reach a perfect mathematical division, we have been unable to do so because of the multiplicity of delegates, the geography of the State and the diversity of population concentrations. The highest degree of under-representation is 3.8% (Thirty-eighth), with the largest over-representation 3.4% (Thirty-third, Thirty-fourth and Thirty-fifth)[8]. The resulting spread of slightly over 7% is a sizeable improvement over the State's plan, which embodied a total variance in excess of 16%.[9] This apportionment is the best we can devise. We believe it comes within passable constitutional limits as "a good-faith effort to achieve absolute equality". Kirkpatrick v. Preis-

cated about 50% of the "home-ported" crewmen maintained residences with Zip Code numbers outside of the Fifth Senatorial District. Upwards of 10,000 live off the base, but within the Fifth Senatorial District.

8. In this arithmetic Accomack and Northampton counties have not been included. The new reapportionment has not involved them because of their isolation from the remainder of the State. They make up the narrow peninsula separated from Virginia's mainland by Chesapeake Bay and the Atlantic Ocean. Their exception does not materially affect the submitted plan.

9. The court's plan will be in slight excess of 8% disparity under the DuVal mode of computing floterial districts, footnote 1, supra.

ler, supra, 394 U.S. 526, 531, 89 S.Ct. 1225, 1229, 22 L.Ed.2d 519 (1969).

An order will now be entered effectuating this opinion.

OREN R. LEWIS, District Judge (concurring in part and dissenting in part).

I wholeheartedly join my colleagues on the panel in approving the reapportionment of the Virginia Assembly, here adopted, with the exception of that portion which divides Fairfax County into two parts for the election of its members to the House of Delegates.

No other city or county has had its delegation in the Virginia House of Delegates so diluted.

All other metropolitan areas in Virginia—Richmond, Norfolk, Newport News, Hampton, Roanoke, Lynchburg and Alexandria, and Arlington, Henrico and Chesterfield Counties were made multi-member districts, with at-large elections; whereas Fairfax County, for all practical purposes, was divided into two multi-member districts with half of its delegates being elected from each half of the county.

Fairfax County is a single political unit. All its officials and its chairman of the Board of Supervisors are elected at large. Its government, school and court systems were established and are maintained on a county-wide basis.

Clearly Fairfax County has been invidiously discriminated against in the election of its members to the House of Delegates solely because of its size.

It has been denied its rightful status as a multi-member district of eleven delegates by my brethren on the panel for fear of Connor [1] criticism and because of their desire to follow the General Assembly's proposed reapportionment as much as possible (the General Assembly was the first to divide Fairfax County)—neither of which is palatable to the citizens of Fairfax County or conforms to the requirements of equity or the equal protection clauses of the Virginia and Federal Constitutions.

The Supreme Court of the United States did not order the dismemberment of the twelve-member Hinds County, Mississippi, delegation because of its size, as read by the majority. It did so because the three-judge federal court from that State found, and I quote, "The District Court's judgment was that a single-member districting would be 'ideal' for Hinds County." 330 F.Supp. 506. To the contrary, shortly after the Connor decision the Supreme Court approved a fifteen-member multi-member district for Marion County, Indiana—Both Virginia and Indiana happen to have a hundred-member House of Delegates.

It hardly follows that a fifteen-member delegation is constitutionally permissible in Indiana and an eleven-member delegation is constitutionally impermissible in Virginia.

All of the objections to a large multi-member district that were here made, were made and disposed of in the Indiana case. Justice White's opinion in Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (June 7, 1971), is well worth reading.

This panel did not hesitate to correct all other inequities and constitutional impermissive variations found in the General Assembly's House of Delegates reapportionment plan and it should not hesitate in so doing in re the division of Fairfax County into two parts.

The desire of the panel to honor the General Assembly's plan of reapportionment, however well intentioned, cannot be allowed to override the constitutional requirement that the citizens of Fairfax County be accorded equal protection in the election of their members to the Virginia House of Delegates.

Therefore, District No. 18—half of Fairfax—and District No. 19—the other half of Fairfax—should be merged into a single eleven-member district for the at-large election of Fairfax's allotted members to the Virginia House of Delegates.

1. Connor v. Johnson, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (June 3, 1971).

NEW DISTRICTS
#47 POP. 46,146 dev. (-0.729%)
#48 POP. 45,850 dev. (-1.366%)
NEW DISTRICTS
#16 POP. 46,065 dev. (+3.33%)
#26 POP. 93,300 dev. (+0.35%)
#11 POP. 93,949 dev. (+1.0%)
NEW DISTRICTS
#12 POP. 46,803 dev. (-0.9%)
NEW DISTRICTS
#27 POP. 46,235 dev. (-0.64%)
#31 POP. 46,552 dev. (+0.14%)
NEW DISTRICTS
#5 POP. 46,305 dev. (-0.39%)
NEW DISTRICTS
#4 POP. 47,677 dev. (+2.56%)
NEW DISTRICTS
#1 POP. 94,659 dev. (+1.8%)

## INTERLOCUTORY ORDER

On June 16, 1971 the Court as constituted for the trial of each of these actions heard the arguments of counsel upon the evidence adduced by all of the parties, including the plaintiff- and defendant-intervenors, in each of these actions, consisting of depositions and documentary evidence, as well as explanatory exhibits presented with the arguments, and upon consideration thereof with the evidence proffered by plaintiff-intervenors William S. Thornton et al. on June 17, 1971, the respective courts in a joint written opinion this day filed have stated their findings of fact and conclusions of law in their respective causes. For the reasons stated in the opinion, it is, in all of said actions, adjudged, ordered and decreed as follows:

1. That the Acts of the General Assembly of Virginia generally known as the reapportionment statutes of 1971, and more particularly designated as the Act approved March 1, 1971, Chapter 116, Code of Virginia Section 24.1–12.1, and the Act approved March 1, 1971, Chapter 120, Code of Virginia Section 24.1–14.1, as amended by an Act approved June 14, 1971, Chapter 246, be, and each of them, is hereby declared invalid on the ground that they include provisions violating the Equal Protection Clause of the Constitution of the United States;

2. That members of the Senate and of the House of Delegates of the General Assembly of Virginia be elected from the electoral districts described in said opinion, anything in the existing statutes of the Commonwealth of Virginia to the contrary notwithstanding;

3. That such of the defendants herein, and their successors in office, as are charged by law with the conduct of said elections, as well as the agents, employees and attorneys thereof, be, and each of them is hereby, enjoined and restrained from conducting any of said elections in any electoral districts except those established and specified in said opinion as aforesaid;

4. That the Governor and Attorney General of Virginia be, and they are now, dropped as parties to these actions;

5. That the plaintiffs recover the costs allowed by law; and

6. That jurisdiction of each of these suits be, and it is hereby, retained for enforcement of this order, the determination of any related matter, and for any other appropriate purpose.