Argued May 18, affirmed August 20,
reconsideration denied September 25,
petition for review denied November 20, 1979

KANE,
*Appellant,*
*v.*
PAULUS,
*Respondent.*

(No. 107-358, CA 12096)

599 P2d 1154

Henry Kane, Beaverton, argued the cause and filed the briefs pro se for appellant.

Al J. Laue, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Tanzer, Richardson and Roberts, Judges.

TANZER, J.

**TANZER, J.**

Petitioner brought this mandamus proceeding to obtain a writ commanding the Secretary of State to amend the subdistrict boundaries of the Metropolitan Service District. He raises numerous challenges, none of them substantial. His principal contentions are that defendant exceeded her statutory authority and violated specific statutory directives in drawing the present subdistrict boundaries and that the population disparities among the subdistricts violate the equal protection clause of the Fourteenth Amendment as well as statutory requirements. The trial court denied relief, petitioner appeals, and we affirm.

Reorganization of the Metropolitan Service District (MSD) which serves the Portland Metropolitan area, including Clackamas, Multnomah and Washington counties, was authorized by the 1977 legislature and approved by the voters of the three counties in a May, 1978, election. Oregon Laws 1977, ch 665, § 5,[1] directs defendant, the Secretary of State, to form 12 subdistricts, each of which is to elect one councilor to serve on the MSD governing body. Section 5(2) of the legislation provides guidelines for drawing the subdistrict boundaries:

"The size and area of each subdistrict shall be determined by the Secretary of State within 60 days of the effective date of this 1977 Act in a manner providing for substantially equal population in each subdistrict based on the most recent state census. Area within each subdistrict shall be contiguous. In apportioning for subdistricts the Secretary of State shall give consideration to existent precincts and maintaining historic and traditional communities as opposed to following existent city, county or special district boundaries or the political boundaries of state representative or state senate election districts except when these political boundaries coincide with natural boundaries. The Secretary of State shall

[1] Because the 1977 revisions to ORS were compiled and printed prior to the voter approval of the 1977 Oregon Laws, ch 665, the new statutory sections and amendments do not appear in the 1977 edition of the Oregon Revised Statutes. Chapter 665, § 5 will appear in the 1979 edition as ORS 268.200.

[457]

reapportion the subdistricts after each United States decennial census data is compiled and released."

In July, 1978, defendant announced the subdistrict boundaries, which are shown on the map reproduced below. We will set out additional facts as they relate to each of petitioner's contentions.

## I

■■ Petitioner's first contention is that subdistricts 2 and 3 violate the statutory requirement that the area within each subdistrict be contiguous. The term "contiguous" means "being in actual contact; touching along a boundary or at a point." Webster's New Collegiate Dictionary (1976). Clearly, the areas of subdistricts 2 and 3 are contiguous under the ordinary meaning of the term. Petitioner argues that the term also means that the subdistricts must be reasonably compact and have regular boundaries.

Contiguity requires only that two parcels share a common boundary at some point. It does not require any particular shape. In the context of annexation, the shape of an annexed parcel may be so irregular as to be evidence of unreasonableness of purpose for the annexation, *Portland Gen. Elec. Co. v. City of Estacada,* 194 Or 145, 159-61, 241 P2d 1129 (1952), but there is nothing unlawful about an irregular shape itself, *Mar. Fire Dist. v. Mar. Polk Bndry,* 19 Or App 108, 114-18, 526 P2d 1031 *rev den* (1974). In any event, a statutory requirement of contiguity is not a requirement of any particular shape. Subdistricts 2 and 3 are contiguous.

## II

Petitioner's second contention concerns the other factors defendant considered in drawing the boundaries of subdistricts 2 and 3. Both subdistricts traverse the Tualatin Mountains which separate Washington and Multnomah counties, and include parts of both counties. Petitioner contends that the statute mandates use of the Tualatin Mountains as a subdistrict boundary because it is a natural boundary coinciding with the boundary separating Multnomah and Washington counties. He also argues that it was unlawful to blend rural and urban interests because that is not one of the factors listed in the statute. These arguments misconstrue the nature of the statutory mandate and defendant's authority under it.

[459]

■   The drawing of political boundaries necessarily reflects value judgments. The statute authorizing defendant to draw the boundaries expresses certain factors to guide her judgment, but it does not restrict her official action to mechanical application of statutory criteria. Rather, the statute grants broad discretion. The question, then, is not whether defendant relied on considerations not listed in the statute, for the statute does not purport to provide comprehensive guidance. Rather, the issue is whether in the exercise of her discretion she arbitrarily ignored statutory considerations or relied upon considerations which are forbidden by law. The record contains no suggestion of any such impropriety.

■■   Defendant testified that she drew the boundaries with the following goals: to equalize subdistrict populations as much as possible, to follow traditional neighborhood and precinct lines, to use the Willamette River as a boundary, to avoid fragmentation of Portland's black community, and to blend urban and rural interests. The latter factors are not mentioned in the statute. Because the statute does not exclude considerations other than the enumerated factors, blending urban and rural interests is not unlawful in itself. There is no suggestion in the record that this approach to subdistricts 2 and 3 was based on improper motives or that it invidiously operates to dilute the voting strength of any recognized political group[2] and it is therefore lawful. *Cf. United Jewish Organizations v. Carey,* 430 US 144, 97 S Ct 996, 51 L Ed 2d 229 (1977).

---

[2] Petitioner argues that the boundaries of subdistricts 2 and 3 dilute the voting strength of Washington County residents. The problem is like an optical illusion: what dilutes and what strengthens depends upon how one looks at it. The petitioner and the defendant look at the problem differently, but it is to defendant that the legislature has given authority. As defendant looks at it, both subdistricts 2 and 3 have a majority of Washington County residents. If the boundaries were drawn as petitioner suggests, only one of those two subdistricts would have a Washington County majority. Moreover, the statute instructs defendant not to follow county lines for their own sake, and we have no basis for holding that the line between Multnomah and Washington counties, by itself, divides voters into recognized political groups with distinct interests.

Regarding use of the Tualatin Mountains as a subdistrict boundary, there was testimony that it would have caused conflicts with other statutory guidelines. In sum, petitioner has established nothing that even faintly suggests that the factors relied upon by defendant in the exercise of her discretion were arbitrary, contrary to statute or otherwise unlawful.

## III

Petitioner's third contention is that the population disparities among MSD subdistricts are impermissibly large and thus deny Washington County residents equal protection of law. The mean population for the MSD subdistricts is 70,907. The largest subdistrict contains 74,413 people, or 4.9 percent above the mean. The smallest subdistrict has a population of 68,580, or 3.3 percent below the mean. Thus, the total deviation from smallest to largest is 8.2 percent. The average deviation is 2.53 percent.

The statute does not require exact population equality, for that would be impossible. Rather, it requires "substantially equal population in each subdistrict." At least as that phrase applies to this case, we construe the statutory phrase to have a meaning consistent with the constitution. The equal protection clause of the Fourteenth Amendment "permits no substantial variation from equal population in drawing districts for units of local government having general governmental powers over the entire geographic area served by the body." *Avery v. Midland County,* 390 US 474, 485, 88 S Ct 1114, 20 L Ed 2d 45 (1968). More recent United States Supreme Court cases indicate that the 8.2 percent deviation in this case is considered relatively insubstantial and does not violate the equal protection clause.

In *Mahan v. Howell,* 410 US 315, 325-28, 93 S Ct 979, 35 L Ed 2d 320 (1973), the Supreme Court held that a state legislative apportionment in which there was a maximum population deviation of 16.4 percent between the most and least populous district did not

violate equal protection, because the deviation was justified by a state policy in favor of maintaining local political subdivision boundaries. Thereafter, in *White v. Regester,* 412 US 755, 764, 93 S Ct 2332, 37 L Ed 2d 314 (1973), the Court pointed out that *Mahan* did not hold "that *any* deviations from absolute equality, however small, must be justified" by a reasonable state policy which necessitates the population disparities. (Original emphasis.) In *White,* the Court held:

> "* * * [W]e cannot glean an equal protection violation from the single fact that two legislative districts in Texas differ from one another by as much as 9.9 percent, when compared to the ideal district. Very likely, larger differences between districts would not be tolerable without justification 'based on legitimate considerations incident to the effectuation of a rational state policy,' *Reynolds v. Sims,* 377 US at 579, 12 L Ed 2d 506; *Mahan v. Howell, supra,* at 325, 35 L Ed 2d 320, but here we are confident that appellees failed to carry their burden of proof insofar as they sought to establish a violation of the Equal Protection Clause from population alone."

In this case, the maximum deviation among subdistricts is less than that approved in *White v. Regester* without special justification based on state policy. Moreover, the statutory policy of respecting precinct lines and traditional communities is analogous to the policy accepted in *Mahan v. Howell* as justification for a 16.4 percent deviation.

■ The foregoing should not be read to imply that constitutional analysis in this area has become a game of headcounting and case-matching. Rather, the law recognizes that population and geography do not always mesh neatly and that population is almost never a stable factor. Therefore, the law does not bar reasonable disparity; it bars only that disparity which arbitrarily and substantially denies equality of participation in the political process. The mathematics of this case do not come close to suggesting such a denial.

The population disparities among the MSD subdistricts do not violate constitutional or statutory requirements of substantial equality.

### IV

■ Finally, petitioner contends that the trial court erred in sustaining a relevancy objection to a line of inquiry intended to show that defendant could have achieved greater equality of population among the subdistricts by obtaining population estimates for split census tracts. Defendant exercised her statutory discretion. Thus the issue is whether her action was permissible, not whether some other action would have been preferable. Because defendant drew the MSD subdistrict boundaries in such clear compliance with all legal criteria, it was not error to sustain an objection to questions about whether she could have drawn them differently.

Affirmed.